LOUIS DICESARE, II,
        *Plaintiff*,

        v.                                          No. 3:15-cv-01703 (VAB)

TOWN OF STONINGTON, *et. al.*,
        *Defendants*.

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Louis DiCesare, II ("Plaintiff") brings this action against Barbara J. McKrell, Vincent A. Pacileo, and the Town of Stonington ("Town" or collectively "Defendants"). ECF No. 43. Mr. DiCesare's Amended Complaint consists of seven counts, alleging various U.S. Constitution violations under 42 U.S.C. § 1983 ("Section 1983") due to his termination, retaliation under different Connecticut statutes, and retaliation in violation of the Family and Medical Leave Act ("FMLA").

Defendants moved for summary judgment on all counts. ECF No. 70. Plaintiff has also moved for summary judgment on all counts. ECF No. 93.

For the following reasons, the Court **GRANTS** Defendants' motion in part and **DENIES** Plaintiff's motion for summary judgment in its entirety. The Court also declines to exercise supplemental jurisdiction over Mr. DiCesare's remaining state law claims and therefore remands them back to Connecticut Superior Court.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Allegations

Mr. DiCesare alleges that he was a Highway Supervisor from February 2009 through April 30, 2015. Second Am. Compl., at ¶ 5, ECF No. 43 ("Second Am. Compl."). On or about

January 21, 2014, Mr. DiCesare allegedly became a bargaining member covered by the Collective Bargaining Agreement ("CBA") between the Town and the Stonington Public Administrators Association, Connecticut Independent Labor Union, UE Local #54 ("Local 54"). *Id.* at ¶ 2. On or around February 24, 2014, Ms. McKrell became the Town's Director of Public Works. *Id.* at ¶ 13. This case concerns Mr. DiCesare's various allegations regarding Defendants' conduct between July 2014 and April 30, 2015. *Id.* at ¶¶ 17–55.

Mr. DiCesare alleges that the Highway Supervisor position was a non-bargaining union position at the time of his appointment. *Id.* at ¶ 16. On or around July 23, 2014, Local 54 filed a petition with the State Board of Labor Relations ("SBLR") seeking to include the Highway Supervisor position. *Id.* at ¶ 17. Mr. DiCesare alleges that the Town openly opposed Local 54's petition and "strenuously objected" through its attorneys to keep Mr. DiCesare out of the bargaining unit. *Id.* at ¶17–18. After Local 54 filed the petition, Mr. DiCesare alleges that he has "a target on his back," and Ms. McKrell was "gunning for his job" because he sought inclusion in the bargaining unit. *Id.* at ¶ 19.

Mr. DiCesare further alleges that Ms. McKrell took several "retaliatory" actions against him, such as "increased instances of her directly supervising highway crews in circumvention of the Plaintiff as the Highway Supervisor, modification of the Plaintiff's duties without explanation or notice, elimination and/or reduction of Plaintiff's duties resulting in increased overtime for other employees, ignoring Plaintiff's request to discuss performance expectations and responsibilities, and falsely accusing the Plaintiff of missing deadlines and/or not performing up to expectations . . ." *Id.* at ¶ 20.

On or about September 16, 2014, the SBLR ordered an election to include the Highway Supervisor position in Local 54's collective bargaining unit. *Id.* at ¶ 21. On October 8, 2014,

Local 54 voted the position into the unit. *Id.* SBLR later modified Local 54 to include the Highway Supervisor over the Town's objections. *Id.*at ¶ 33. On March 27, 2015, the decision became final, retroactive to January 21, 2015. *Id.*

On October 9, 2014, Mr. DiCesare alleges that the First Selectman "publicly berated the Plaintiff on a Facebook page that he regularly used to post Town information," where the First Selectman apologized to the public for "substandard management" of the project. *Id.* at ¶ 22. Mr. DiCesare claims that the First Selectman's statements cast him in a falsely negative light related to the project. *Id.* As a result, Mr. DiCesare allegedly experienced physical and emotional problems that forced him to take medical leave for ten days in October 2014. *Id.* at ¶ 23.

According to Mr. DiCesare, Ms. McKrell continued to treat him in a "hostile and retaliatory manner" in retaliation for exercising his union participation rights and allegedly increased during his medical absence. *Id.*at ¶ 24.

On or around October 30, 2014, Ms. McKrell met with Mr. DiCesare to allegedly discuss his "responsibilities and/or decisions with respect to the leaf removal program" where, according to Mr. DiCesare, Ms. McKrell yelled at him. *Id.* at ¶ 25. Later that evening Ms. McKrell allegedly removed Mr. DiCesare from another project, and Mr. DiCesare responded to the e-mail complaining of "retaliation for his recent union participation." *Id.* at ¶ 26. Five days later, Ms. McKrell allegedly issued a written warning related to his temper at the October 29, 2014 meeting. *Id.* at ¶ 27.

On or around December 18, 2014, Mr. DiCesare spoke to the First Selectman regarding Ms. McKrell's handling of winter snow and ice operations, and the First Selectman directed Mr. DiCesare to discuss any concerns with Ms. McKrell. *Id.* at ¶ 28.

### 1.  January 2015 Suspension

On or around January 7, 2015, Ms. McKrell issued a pre-disciplinary notice informing Mr. DiCesare of her intention to impose a five-day suspension for "insubordination and insufficient planning." Second Am. Compl., at ¶ 29. On or around January 16, 2015, Mr. DiCesare claims that he and his attorney went to meet with Ms. McKrell and the First Selectman to present documentation and information in response to Ms. McKrell's proposed suspension. *Id.* at ¶ 31. A police sergeant allegedly did not allow Mr. DiCesare's attorney to accompany him to the meeting. *Id.* at ¶ 31. On or around January 20, 2015, the Town suspended Mr. DiCesare for five working days. *Id.* at ¶ 32.

### 2.  April 2015 Termination

Following the five-day suspension, Mr. DiCesare took medical leave under the FMLA until March 23, 2015. Second Am. Compl., at ¶ 34.

On March 22, 2015 Ms. McKrell sent Mr. DiCesare by e-mail a two-page memorandum taking away his work vehicle, moving his office form the highway garage to town hall, and providing an hour-by-hour schedule for Mr. DiCesare's day. *Id.* at ¶ 35.

On or around April 26, 2015, Mr. DiCesare sent the First Selectman an e-mail regarding possible unethical use of Town vehicles by an employee. *Id.* at ¶ 40.

On or around April 30, 2015, Ms. McKrell directed Mr. DiCesare to report to her office. *Id.* at ¶ 41. When he arrived, Ms. McKrell had a union representative present and allegedly handed Mr. DiCesare a written memorandum regarding her intention to terminate his employment. *Id.* at ¶ 42.

Mr. DiCesare returned about twenty minutes later to ask Ms. McKrell to postpone the meeting to allow proper notice of the allegations, to prepare responses, and have his chosen

union representative; she denied the request. *Id.* at ¶¶ 43, 44. The meeting ended at approximately 7:50 a.m. *Id.* at ¶ 45.

Ms. McKrell allegedly terminated Mr. DiCesare at approximately 11:30 a.m. with a three-page memorandum. *Id.* at ¶ 46.

### 3.    Grievance History and Subsequent Arbitration

On or around January 26, 2015, Mr. DiCesare filed three grievances with Vincent Pacileo related to Plaintiff's five-day suspension and Ms. McKrell's denial of his personal representation at the January 13, 2015 pre-disciplinary meeting. *Id.* at ¶ 39. On March 6, 2015, Mr. Pacileo notified Mr. DiCesare that he would not move forward with the grievance because he had been suspended before the SBLR reached a decision on the Highway Supervisor position. Defs.' Mem. of Law in Supp. of Mot. for Summ. J., at 21, ECF No. 70 ("ECF No. 70"). After Mr. DiCesare returned from FMLA leave, he met with Mr. Pacileo about his grievances. *Id.* Mr. Pacileo denied each grievance.

Following his April 30, 2015 termination, Mr. DiCesare filed a grievance through Local 54. *Id.* at ¶ 58. On or around May 26, 2015, Mr. Pacileo denied Local 54's grievance related to Mr. DiCesare's termination. ECF No. 70, at 21.

On or around July 13, 2015, Mr. DiCesare submitted his suspension and termination grievances to arbitration under the CBA. ECF No. 70, at 22. There were sixteen arbitration hearings related solely to Mr. DiCesare's suspension between December 7, 2015 and August 8, 2017. *Id.* On or around March 2, 2018, the Arbitrator found that the Town did not have just cause to suspend Mr. DiCesare because the Town did not allow the Plaintiff to have a Union Representative present during the pre-disciplinary hearing. *Id.*

Five more arbitration hearings have taken place regarding Mr. DiCesare's termination,

with a ruling set for January 2019. *Id.* at 23; Pl.'s Opp'n to Defs.' Mot. for Summ. J. and Cross-Mot. for Summ. J., at 12, ECF No. 93 ("ECF No. 93").

**B.  Procedural History**

On October 27, 2015, Mr. DiCesare filed a Complaint in the Connecticut Superior Court against Barbara McKrell, Vincent Pacileo, and the Town of Stonington. ECF No. 2, Ex. A, at 7. On November 19, 2015, Defendants removed the case to this Court. *Id.*

On January 14, 2016, Mr. DiCesare amended his twelve-count complaint. ECF No. 18. In response, Defendants moved to dismiss six counts, arguing that Mr. DiCesare did not exhaust administrative remedies under the Collective Bargaining Agreement on four counts and that another count did not create a private right of action. ECF No. 23. On March 17, 2017, the Court dismissed all but the FMLA count because Mr. DiCesare did not need to exhaust grievance procedures to bring his FMLA claim. ECF No. 37.

On May 12, 2017, Mr. DiCesare amended his Complaint against the Defendants. ECF No. 43. On June 30, 2017, Defendants answered the Amended Complaint with affirmative and special defenses. ECF No. 45. On July 14, 2017, Mr. DiCesare responded to the Amended Complaint. ECF No. 46.

On January 24, 2018, the Court held a telephonic status conference where the parties agreed to a February 9, 2018 deadline on remaining discovery. ECF No. 64.

On April 27, 2018, Defendants moved for summary judgment. ECF No. 70. On November 9, 2018, Mr. DiCesare responded to the motion and cross-moved for summary judgment. ECF No. 97. On November 26, 2018, the Court held a hearing on the summary judgment motions.

## II.    STANDARD OF REVIEW

Courts will grant a motion for summary judgment when the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing specific facts to prove that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party, however, may satisfy this burden by pointing out an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When documentary evidence and sworn affidavits supports a motion for summary judgment "demonstrate[] the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of

material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017). A court will not credit conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor and the court will find for the moving party as a matter of law and grant the summary judgment motion. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## III.    DISCUSSION

Mr. DiCesare claims that Defendants violated his rights under the Connecticut Constitution, the U.S. Constitution, the laws of the United States, and the laws of the State of Connecticut. Mr. DiCesare seeks monetary damages.

The Court addresses Mr. DiCesare's federal claims first because if he has no viable claims under federal law, this case should be remanded back to Connecticut Superior Court.

### A.    The Federal Constitutional Claims

Section 1983 does create a private right of action against "persons" who, acting "under color of [law]," violate a plaintiff's constitutional rights—regardless of whether that person was acting under an unconstitutional state law, regulation, or policy. 42 U.S.C. § 1983. Because Section 1983 does not create a separate cause of action but only serves as a procedural vehicle for the adjudication of violations of constitutional rights, Mr. DiCesare only has a viable Section

1983 claim if he is alleging a violation of a constitutional right. *See Whitnum v. Emons*, No. 3:15-cv-959 (SRU), 2016 WL 2644886, at *2 (D. Conn. May 9, 2016) ("Section 1983 is the mechanism that a plaintiff may use to bring a cause of action in federal court based on a perceived violation of the U.S. Constitution . . . Unless a plaintiff can point to another statutory provision or judicial doctrine that permits individuals to bring an action to enforce a constitutional right, a plaintiff who fails to meet the elements of Section 1983 may not bring a constitutional claim in federal court"). Mr. DiCesare claims to have viable constitutional claims under the First and Fourteenth Amendments of the U.S. Constitution.

The Court disagrees.

### 1. First Amendment Freedom of Speech

Public employee speech claims involve a two-step inquiry: (1) "whether the employee spoke as a citizen on a matter of public concern" and, if so, (2) "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v.* Ceballos, 547 U.S. 410, 418 (2006). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for employers to operate efficiently and effectively." *Id.* at 419. But "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

Defendants moved for summary judgment because Mr. DiCesare made his statements as an employee, not a private citizen. Specific to the First Amendment claim are two e-mails. In the December 17, 2014 e-mail, Mr. DiCesare expressed concerns regarding Town changes to ice remediation. In the April 28, 2015 e-mail, Mr. DiCesare sought to obtain clarity on two Town

policies to deliver information to the public; one related to the use of equipment by a highway worker and the other being disposal of materials on private property. Because Mr. DiCesare was neither speaking on matters of public concern nor commenting as a private citizen, Defendants argue that the First Amendment did not protect his speech under *Garcetti*.

In response, Mr. DiCesare argues that his speech addressed potentially unsafe practices affecting third parties, which makes them an issue of public concern. He argues that a jury could conclude that his December 2014 e-mail to the First Selectmen related to unsafe snow and ice removal policies that would impact public safety. Similarly, he argues that his April 28, 2014 e-mail related to employee misuse of Town materials for potential financial gain. Mr. DiCesare argues that the public safety concerns with the December 2014 e-mail and the ethical concerns in the April 28, 2014 e-mail are protected speech related to matters of public concern. Finally, Mr. DiCesare argues that Defendants suspended him due to the first e-mail and fired him due to the second e-mail.

In reply, Defendants argue that Mr. DiCesare's speech was not on a topic of public concern. First, the comments made on December 17, 2014 raised personnel issues regarding Ms. McKrell's proposed handling of winter maintenance. Rather than commentary on a matter of public concern, Defendants argue that this is a policy disagreement between two Town employees. Second, the April 28, 2015 e-mail was about clarification on Town policy, not a matter a public concern. In both e-mails, Plaintiff made statements within his official job duties, therefore, the First Amendment does not protect those statements. And, even if the First Amendment protected the statements, Defendants did not suspend or terminate Mr. DiCesare because of his speech.

Here, Mr. DiCesare's speech falls squarely within his official duties as an employee, and

not as a private citizen. According to the Town Highway Supervisor job description, the "Highway Supervisor is responsible for the day-to-day operations of the Highway Department." ECF No. 71-5. This work includes "preparation of work schedules and preparation of advance logistics for upcoming projects, ordering materials, and obtaining necessary equipment and supplies, as appropriate." Examples of essential job functions consisted of assisting the Director of Public Works "with prioritizing Highway Department projects; plan[ning] work schedules of all Highway Department personnel, including daily work assignments." *Id.* Both of Mr. DiCesare's alleged First Amendment violations deal with work-related grievances not protected by First Amendment.

First, in the December 17, 2014 e-mail entitled "Winter operations," Mr. DiCesare expressed concern to George Crouse that Ms. McKrell thought it was an unnecessary use of funds to use personnel for spot salting and wanted Mr. DiCesare to contact "other towns to see what they were doing before making a decision to send manpower out to salt." ECF No. 71-21. After that meeting, Ms. McKrell "would be the first point of contact with the police department regarding any 'salting issues'" and Mr. DiCesare was concerned about the "unacceptable delays" that happened when Ms. McKrell's predecessor had police alert the Highway Department of ice, rather than allowing the Highway Supervisor to monitor the issue. *Id.* The remaining portions of the e-mail dealt with "unacceptable" personnel staffing decisions and Mr. DiCesare's belief that the Town "should enter this plowing season under the guidelines in place prior to Ms. McKrell's hiring." *Id.*

Second, in the April 28, 2015 e-mail to Ms. McKrell and other Town staff entitled "Town Resident concerns," Mr. DiCesare states that "I have been contacted by a couple of Town residents with questions and concerns and I felt it was imperative that I answer those concerns as

quickly and as accurately as I can." ECF No. 94-27. In detailing those two issues, Mr. DiCesare

said that one "is related to work being performed by the Highway Department at the laydown

area at West Pavilion . . . related to the use of equipment owned by Town employees." *Id.* The

second issue is related to "the fact that a resident saw a Town of Stonington truck in the areas of

Welles Street at westerly" potentially disposing of raw materials on property that "had occurred

in the past and was discouraged." *Id.* In closing his e-mail, Mr. DiCesare asked for "the

necessary guidance," so he could "pass on the accurate information to the town residence." *Id.*

In both e-mails, Mr. DiCesare "did not act a citizen when he went about conducting his

daily professional activities." *See Garcetti*, 547 U.S. at 422 ("[w]hen he went to work and

performed the tasks he was paid to perform, [Plaintiff] acted as a government employee").

Rather, Mr. DiCesare was making "statements pursuant to [his] official duties." *Id.* at 421. As

Highway Supervisor, Mr. DiCesare was responsible for personnel, work schedules, and

equipment. ECF No. 71-5. These e-mails relate directly to those responsibilities. In these

circumstances, he was "not speaking as a citizen for First Amendment purposes, and the

Constitution does not insulate [his] communications from employer discipline." *Id.* Mr.

DiCesare's e-mails thus were part of his responsibilities as a Highway Supervisor.

The Court therefore finds that there is no genuine issue of material fact regarding the

First Amendment.

### 2.     Fourteenth Amendment Procedural Due Process

"To plead a violation of procedural due process, a plaintiff must plausibly allege that

[they were] deprived of property without constitutionally adequate pre- or post-deprivation

process." *J.K. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013); *Henry v. City of N.Y.*, 638 Fed. App'x

113, 115 (2d Cir. 2016). To do this, a plaintiff must "first identify a property right, second show

that the government has deprived him of *that* right, and third show that the deprivation was effected without due process." *T'Kach*, 714 F.3d at 105 (emphasis in original).

Here, the parties do not dispute that there is a valid property interest or that Mr. DiCesare's termination deprived him of that property interest. Indeed, the CBA creates a contract right under Connecticut law. *See Slifkin v. Condec Corp.*, 13 Conn. App. 538, 549 (1988) ("An employment contract for a definite or determinable term, however, may be terminated by either party only for good or just cause"); *Madigan v. Hous. Auth. of Town of East Hartford*, 156 Conn. App. 339, 350 (2015) (finding that "'just cause' was required by the express terms of the plaintiff's agreement in order to terminate the plaintiff's employment as executive director [of the town housing authority]"). There is also not an issue of whether the government deprived Mr. DiCesare of that right because Ms. McKrell fired him. *See Cleveland Bd. of Educ. V. Loudermill* 470 U.S. 532 (1985) ("the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood").

Accordingly, the Court will only address the final element—what process is due under the circumstances.

### a.    Due Process—Property Interest

Defendants argue that Mr. DiCesare's procedural due process arguments fail because the Town provided adequate pre- and post-deprivation due process related to Mr. DiCesare's property interest in non-termination. Defendants' argue that pre-deprivation process need not be more elaborate than notice and opportunity because it serves a limited function. ECF No. 70, at 41–42. (citing *O'Connor v. Pierson*, 426 F.3d 187, 198 (2d Cir. 2005)). Moreover, due process can be satisfied if the government offers a full adversarial hearing post-termination. *Id.* at 42

(citing *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001)). During the pre-disciplinary meeting, Defendants afforded Mr. DiCesare an opportunity to address his deficiencies, but he chose not to answer seven of the eight questions. He also did not give explanations for his deficient performance. Defendants argue that those opportunities were enough for pre-termination due process.

Defendants also argue that post-deprivation proceedings were sufficient for due process. Specifically, the CBA afforded Mr. DiCesare a full adversarial process through arbitration. During the arbitration proceedings, there were five hearings where both the Town and Local 54 presented evidence and argument related to Mr. DiCesare's termination.

In response, Mr. DiCesare argues that Defendants deprived his property interest in his job as Highway Supervisor without adequate due process. Plaintiff argues first that he had a protected property interest in his full-time employment with the Town because the CBA made him subject to removal only with a just cause showing. Plaintiff argues that the removal for just cause standard entitled him to notice of charges against him, an explanation of the employer's evidence, and an opportunity to present his side before termination. Mr. DiCesare alleges that Ms. McKrell gave him one sheet of paper with no sign of the basis for termination, he was unable to choose his union representation, he was denied an opportunity to review the requested questions, was not prepared to answer the questions verbally, and was fired two hours later. He argues that no reasonable factfinder could find that Defendants' pre-termination actions provided proper due process.

In reply, Defendants argue that the post-termination procedures are relevant to the necessary scope of pre-termination procedures. Because the CBA requires a full adversarial proceeding post-termination, notice and a limited opportunity to be heard pre-termination is

enough to ensure constitutional due process.

### b.     Due Process—Liberty Interest

Defendants also argue that Mr. DiCesare cannot win on procedural due process grounds because the Town provided adequate pre- and post-deprivation due process related to Mr. DiCesare's liberty interest in his community standing. Defendants argue that Plaintiff's post-deprivation hearings were more than adequate to protect Mr. DiCesare's reputational and professional interest. For the same reasons due process was sufficient for Mr. DiCesare's property interest, they argue his pre- and post-deprivation hearings satisfy adequate due process for the Plaintiff's liberty interest.

In response, Mr. DiCesare argues that the public stigmatization from false statements by Town officials infringed upon his liberty interest in his reputation. Plaintiff argues that accusations of lying and lack of credibility as a public official speak to Mr. DiCesare's reputation for honesty and morality in the community. Mr. DiCesare claims that because Town employees terminated him absent sufficient-pre-termination process, the Court should grant summary judgment in his favor based on his liberty interest and lack of due process.

In reply, Defendants argue that availability of a post-termination name-clearing hearing is sufficient to defeat a claim of liberty interest deprivation under the stigma plus termination. Defendants argue that the post-termination arbitration hearings are enough to protect Mr. DiCesare's reputational and professional interests. Defendants argue that they gave Mr. DiCesare notice and opportunity to be heard pre-termination and full adversarial opportunities post-termination, which creates procedural adequacy in protecting his liberty interest.

### c.     The Alleged Constitutional Deprivation

Here, Mr. DiCesare does not dispute that the post-termination grievance proceedings

occurred but argues that the post-termination procedure does not cure the pre-termination violation. His analysis centers on his pre-termination proceedings, however, is not correct. *See Loudermill*, 470 U.S. at 547–48 ("We conclude that all the process that is due is provide by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by [state] law"); *Locurto*, 264 F.3d at 171 ("When such a public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards"); *O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) ("ultimate conclusion about procedural adequacy . . . turns on the full set of pre- and post-deprivation procedures available"). Nevertheless, both the Town's pre- and post-termination proceedings meet the constitutional threshold for due process here.

First, pre-termination due process merely requires "'some of kind' of hearing prior to the discharge of an employee who has a constitutionally protected property interest in [their] employment" along with "notice and opportunity for hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 542. The process serves as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46; *Faghri v. Univ. of Conn.*, 621 F.3d 92, 99 (2d Cir. 2010) (same). "The pretermination process 'need not be elaborate' or approach the level of a 'full adversarial evidentiary hearing,' but due process does require that before being terminated such an employee [be given] oral or written notice of the charges against [them], an explanation of the employer's evidence, and an opportunity to present [their side] of the story." *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002).

Here, Mr. DiCesare had a hearing before his termination where Ms. McKrell provided Plaintiff written notice, a written explanation of the Town's evidence, and an opportunity to present his side of the story. On the morning of April 30, 2015, Ms. McKrell awaited Mr. DiCesare's arrival with a union representative and then provided Mr. DiCesare a written memorandum regarding her intention to terminate his employment. *Id.* at ¶ 42. The April 30, 2015 termination memorandum detailed several instances of alleged insubordination, unprofessional behavior, and needless expenditures by Mr. DiCesare. ECF No. 71-3.[1] Mr. DiCesare was also given a "Notice of right to Representation from Ms. McKrell," which said "[y]ou are hereby directed to report to my Office on Thursday April 30th at 7:30 AM for the purpose of discussing my intention to terminate your employment with the Town of Stonington and provide you with an opportunity to explain your deficiencies." ECF No. 71-37.

At the meeting, Ms. McKrell asked Mr. DiCesare eight questions, *see* ECF No. 71-38, and Mr. DiCesare failed to answer seven of them. ECF No. 71, at 20. On this record, the undisputed facts then are as follows: The Town informed Mr. DiCesare of the disciplinary charges against him, provided Mr. DiCesare a disciplinary hearing, and allowed him to grieve his termination. On these undisputed facts, this "notice and opportunity for hearing" was adequate pre-termination action to satisfy due process. *Loudermill*, 470 U.S. at 542; *Bailey v. Pataki*, 708 F.3d 391, 407 (2d Cir. 2013) ("the Constitution requires some kind of hearing *before* the State

[1] The memorandum outlined "additional expenditures the Town incurred to correct [Mr. DiCesare's] mistakes total[ing] $106,647; delays and low quality related to a paving project, which cost an estimated $59,457 according to the Town Engineer; an allegation that Mr. DiCesare lied to Ms. McKrell when asked for a written explanation, "in which [Mr. DiCesare] claim[ed] that the shoddy planning was another Town employee's fault;" that Mr. DiCesare "lied when [he told Ms. McKrell he was] unaware of the double stacking of the rises" until it was provided to him in a report by the Town Engineer; Ms. McKrell contends that this was not a best practice and "misrepresenting the facts to [her was] simply inexcusable and demonstrate[d] a lack of credibility as well as poor judgment of someone in a supervisory position;" that Mr. DiCesare attempted "to place blame on other Town of Stonington Highway employees for the work that [he] directed them to perform and [was] responsible for overseeing;" and alleges that Mr. DiCesare failed to update timesheets when employees were on leave or completing daily inspection reports for highway department projects. The memorandum also makes note of several affidavits from Town staff.

deprives a person of liberty") (citations omitted) (emphasis in original).

Second, the ongoing post-termination adversarial proceedings were sufficient to find adequate due process. The Town can satisfy its constitutional due process requirements "if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Locurto*, 264 F.3d at 171; *Wright v. City of Syracuse*, 611 Fed. App'x 8, 12 (2d Cir. 2015). The CBA allows arbitration appeals "to the State Board of Mediation and Arbitration" for "interpretation and/or application of the provision(s) of [the CBA] at issue between the Union and the Employer." ECF No. 71-41, at 4–5. Indeed, Mr. DiCesare has pursued multiple grievances under the CBA.

To date, he has already succeeded in his post-termination grievance with the arbitrator related to his January 2015 suspension. ECF No. 70, at 22. And the parties expect the arbitrator to resolve the termination grievance in January 2019. ECF No. 70, at 23. The post-termination arbitration proceedings outlined in the CBA are sufficient to satisfy due process. *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) ("Courts have held that such post-deprivation [CBA arbitration] procedures, providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process"). The Court therefore finds that there is no genuine issue of material fact regarding the Mr. DiCesare's property interest in the Fourteenth Amendment Procedural Due Process.

Finally, Mr. DiCesare's liberty interest claim "requires a plaintiff to allege (1) the utterance of a statement about [them] that is injurious to [their] reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2007); *Crenshaw v. City of New Haven*, 652 Fed. App'x. 58, 60 (2d Cir. 2016). And the

"defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Velez*, 401 F.3d at 87.

In a government employee termination action, a plaintiff must satisfy three elements to demonstrate deprivation of the stigma component of the stigma-plus claim: (1) "the plaintiff 'must . . . show that the government made stigmatizing statements about [them]—statements that call into question [the] plaintiff's 'good name, reputation, honor, or integrity;'" (2) "'a plaintiff must prove these stigmatizing statements were made public;'" and (3) "the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment." *Segal v. City of N.Y.*, 459 F.3d 207, 212–213 (2006) (citations omitted). For due process considerations, however, "the availability of adequate process defeats a stigma-plus claim." *Id.* at 213; *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004) ("A post-deprivation name-clearing hearing may defeat a plaintiff's stigma-plus claim, so long as the hearing is adequate for due process purposes").

On this record, the post-deprivation arbitration proceedings outlined by the CBA are sufficient to allow Mr. DiCesare to remedy any potential stigma related to his termination. *See Patterson*, 370 F.3d 322, 335–36 (stating that a name-clearing hearing "gives the plaintiff an opportunity to hear and answer first-hand any stigmatizing charges, clearing [their] name of any false statements made about [them], and curing the injury to [their] reputation").

The Court therefore finds that there is no genuine issue of material fact regarding the Mr. DiCesare's liberty interest in the Fourteenth Amendment Procedural Due Process.

### B.     FMLA Retaliation Claim

The FMLA provides "an eligible employee . . . a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 § 2612(a)(1). The law further entitles the employee "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms of employment." 29 § 2614. And "[i]t shall be unlawful for any employer to interfere with, restrain or deny the exercise or the attempt to exercise any right provided" by the Act. 29 U.S.C. § 2615.

Under the FMLA, a claim that an employer retaliated against an employee for exercising their FMLA rights is cognizable as interference with their FMLA rights under Section 2615. *Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004). To show a *prima facie* case of FMLA retaliation, the Plaintiff must establish "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

Defendants argue that Mr. DiCesare cannot successfully make an FMLA claim based solely on temporal proximity. Defendants argue that Ms. McKrell never retaliated nor took an adverse action against Mr. DiCesare and that Plaintiff is the first employee to allege she retaliated under the FMLA. Defendants argue that Ms. McKrell did not change the way she supervised Mr. DiCesare after he took FMLA leave, and he does not cite evidence to support a finding of anti-FMLA animus by Defendants.

In response, Mr. DiCesare argues that Ms. McKrell's actions, regarding Mr. DiCesare receiving recognition by the First Selectman for a project he was not involved in, establish that

his termination occurred because of retaliatory intent. This displeasure combined with temporal proximity to his FMLA leave, where Mr. DiCesare was performing no work, proves a retaliatory employment action. Moreover, in his view, Defendants' non-discriminatory reasons for termination do not support the severity of an adverse action of termination.

In response, Defendants argue that temporal proximity, alone, does not create an inference of retaliatory intent. Defendants argue that Ms. McKrell's concern about proper individuals receiving credit for work projects when Mr. DiCesare was on FMLA leave does not show Ms. McKrell retaliated against Plaintiff for taking FMLA leave. Nor do changes in Plaintiff's work conditions after taking FMLA leave, but before termination, demonstrate retaliation.

The Court agrees.

While neither party disputes the first three elements of the *prima facie* case for FMLA retaliation, Mr. DiCesare did not make a sufficient showing on the fourth element to make his FMLA claim viable. Here, it is undisputed that both Mr. DiCesare took FMLA leave and the Town knew about it. McKrell Aff., ECF No 71-2, at 13 ("From approximately January 28, 2015 to March 23, 2015, Mr. DiCesare was on leave pursuant to FMLA;" "I was unaware of the specific reasons for Mr. DiCesare's FMLA leave;" "On or about March 20, 2015, I became aware that Mr. DiCesare was returning to work on March 23, 2015"). Moreover, the genesis of the litigation is Mr. DiCesare's termination, so Mr. DiCesare has met the adverse employment prong. *Id.* at 17 ("At approximately 12:00 PM on April 30, 2015, I directed Mr. DiCesare into my office and provided him with a two (2) page memorandum with the subject line 'Termination Memorandum.'"). The final element of a causal connection between the protected activity and the adverse employment action is the problem.

The adverse employment action here did not occur under circumstances that show retaliatory intent. In this case, Mr. DiCesare's pleadings fail to establish retaliatory intent because "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Elliot-Leach v. N.Y. City Dept. of Educ.*, 710 Fed. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails.").

Aside from the temporal proximity of five weeks from the end of FMLA leave to Mr. DiCesare's termination, Plaintiff relies on an e-mail that only refers to his FMLA leave in passing.[2] But the alleged issue reference in this e-mail relates to a time period when the Town suspended him—not when he was on FMLA leave. Second Am. Compl., at ¶ 32 ("On or about January 20, 2015, Plaintiff was suspended for five (5) working days"); April 13, 2015 E-mail Regarding Lou DiCesare, ECF No 94-18 ("I find it curious that you recognized Lou DiCesare at

_____

[2] At the hearing and in his opposition brief, Mr. DiCesare alleges that Defendants obtained affidavits from staff dealing with Plaintiff's ability to perform the Highway Supervisor job and that these affidavits provide genuine issues of material fact probative of Mr. DiCesare's FMLA retaliation claim. These affidavits, however, are not in the record. And, even if these affidavits were in the record and did provide a genuine issue of material fact with respect to Mr. DiCesare's FMLA claim, this case still would be remanded to Connecticut Superior Court, as discussed below, because Mr. DiCesare's remaining state law claims would predominate over his FMLA retaliation claim. Indeed, the FMLA claim is the alternative ground for two separate state law claims, and Mr. DiCesare dedicated only two of the sixty-three paragraphs in the Second Amended Complaint to the FMLA claim, and less than two of the thirty-five pages of his opposition to Defendants' Motion for Summary Judgment to the FMLA claim. Thus, while this Court has discretion to allow ancillary claims to continue, it need not continue with "what is in effect only a state law case." *Hagans v. Lavine*, 415 U.S. 528, 552 (1975); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727 (1966) ("Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed"); *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 439 (2d Cir. 2011) (same). Because the state retaliation claims predominate, the Court would have, if the FMLA claim survived, remanded the state law and the FMLA claims to Connecticut Superior Court. *See Gibbs*, 383 U.S. at 726–27 ("if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals").

the Press Conference with Governor Malloy today pertaining to our efforts associated with clearing the snow during the Blizzard on January 26, 2015. Lou was suspended from the Town, January 21 to 27, and then out on an extended sick leave until March 23, 2015.").

In other words, the content of this e-mail, to the extent it can be construed as probative of animus for a FMLA retaliation claim, focuses on an event that occurred before Mr. DiCesare went on FMLA leave. Thus, consistent with federal anti-discrimination law, there is no genuine issue of material fact probative of Mr. DiCesare's FMLA retaliation claim. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("stray remarks of a decision-maker, without more cannot provide a claim of employment discrimination"); *Slattery*, 248 F.3d at 92 n. 2 (2d Cir. 2001) (characterizing remarks as "stray" where they were "unrelated to [the plaintiff's] discharge"); *Benson v. Family Dollar Operations, Inc.*, ___ Fed. App'x ___2018 WL 5919905, at *2 (2d Cir. 2018) ("a single comment is insufficient to present a triable issue as to discriminatory motive").

Having failed to establish a *prima facie* case of FMLA retaliation, there is no genuine issue of material fact regarding the Mr. DiCesare's FMLA retaliation claim.

### C.      State and Retaliation Claims

Having dismissed Mr. DiCesare's federal claims, the Court declines to take supplemental jurisdiction over Mr. DiCesare's remaining state law claims. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction'") (citing 28 U.S.C. § 1367(c)(3)).

## IV.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment in part and **DENIES** Plaintiff's motion for summary judgment in its entirety.

The Court also declines to take supplemental jurisdiction over Mr. DiCesare's remaining state law claims and therefore remands the case back to Connecticut Superior Court.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of December 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE